UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DIRECT REPORT CORPORATION d/b/a SHAREHOLDER.COM, <br><br> Plaintiff, <br><br> v. <br><br> CCBN.COM, INC., THE THOMSON CORPORATION, JOHN DOES 1 THROUGH 5, AND JANE DOES 1 THROUGH 5, <br><br> Defendants. | Civil Action No. 04-10535-PBS |

**MEMORANDUM SUPPORTING WITNESS
ROBERT ADLER'S MOTION FOR A PROTECTIVE ORDER**

Prior to his deposition, for which he has been served with a subpoena, nonparty witness Robert Adler ("Adler") notified Plaintiff Direct Report Corporation d/b/a Shareholder.com ("Shareholder") and Defendants CCBN.com, Inc. ("CCBN") and The Thomson Corporation ("Thomson") that he might wish to invoke his privilege against self-incrimination in response to certain questions posed of him. He sought assurances from all parties that if he provided non-incriminating testimony, they would not argue that he had waived his privilege with regard to potentially incriminating testimony. Although counsel for the Defendants was amenable to trying to reach an accommodation regarding such assurances, counsel for Shareholder was not. Adler now seeks a protective order declaring that to the extent he answers questions at the deposition he will not be deemed to have waived his privilege against compelled self-incrimination as to any other questions that may be asked him.

## Statement of the Case

In its First Amended Complaint, Shareholder describes CCBN as its "principal rival" in the business of providing publicly-traded companies with technology and services designed to facilitate communication with shareholders and others in the financial community. See Am. Compl., preamble, ¶¶ 1-2. It then accuses CCBN of essentially hacking into Shareholder's computer network and misappropriating confidential and proprietary information belonging to Shareholder. See generally Am. Compl. Shareholder also names various John Does and Jane Does as defendants, accusing them either participating "in the unlawful infiltration of [Shareholder's] computer systems," covering up CCBN's misconduct, or knowing of the misconduct and making no effort to curtail it or notify Shareholder about it. Id. ¶ 3. Additionally, Shareholder names Thomson as a defendant on the theory that Thomson is CCBN's successor-in-interest. Id. ¶ 4.

The First Amended Complaint consists of ten counts, including allegations that the defendants violated the Federal Stored Wire and Electronic Communications Act, 18 U.S.C. §§ 2701, et seq. (Count I), the Federal Wire and Electronic Communications Interception Act, 18 U.S.C. §§ 2511, et seq. (Count II), the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) (Count III), and both the substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (Counts IV and V), all of which contain criminal law provisions. Additionally, the Massachusetts State Police, in conjunction with the Massachusetts Attorney General's Office, investigated CCBN's offices for possible violations of state law, as alleged by Shareholder. See Am. Compl. ¶ 25 & Ex. A.

In response to these allegations, CCBN and Thomson, jointly represented, filed an answer and counterclaims that essentially accused Shareholder of hacking into CCBN's computer network and misappropriating CCBN's confidential and proprietary information. See generally Ans. & Am. Countercl. In total, CCBN and Thomson asserted five counterclaims against Shareholder, including allegations that Shareholder violated the Computer Fraud and Abuse Act (First Counterclaim) and committed common law fraud (Fourth Counterclaim).

Adler was a co-founder of CCBN and was its president at most times relevant to this dispute. On or about December 3, 2004, Shareholder served Adler, at his house, with a subpoena that commanded him to produce certain documents in less than a week, and to present himself for a deposition on Monday, December 13, 2004. See Affidavit of Richard J. McCarthy Supporting Motion to Quash or Modify Plaintiff's Subpoena (Docket No. 46) ¶ 3. Adler's counsel, Richard J. McCarthy, objected to the short notice, among other things, and tried to reach accommodation with Shareholder's counsel regarding the rescheduling of Adler's deposition. Id.¶¶ 4-5. Specifically, McCarthy proposed January 7, 2005, or January 11, 2005, as alternate dates. Id. ¶ 7. Shareholder's counsel refused to work with McCarthy on this scheduling matter and instead sent McCarthy a new deposition subpoena on December 13, which commanded Adler to produce responsive documents two days later and to present himself for deposition the following Monday. Id. ¶ 8. McCarthy informed Shareholder's counsel that Adler would be unavailable on December 20, but Shareholder's counsel still refused to work with McCarthy on scheduling a different date. Id. ¶¶ 9-10. As a result, Adler had no recourse but to file a Motion to Quash or Modify Plaintiff's Subpoena. See Docket Nos. 44-45.

This Court referred the motion to U.S. Magistrate Judge Alexander, who entered an electronic order granting the motion. See Electronic Order of Dec. 20, 2004.[1] The Order stated that "[c]ounsel shall confer and agree to a date for the deposition in January which shall be followed by the usual notice." Id. Shortly thereafter, Shareholder's counsel and McCarthy exchanged emails regarding possible deposition dates in January. See Affidavit of Richard J. McCarthy, dated January 10, 2005 ("Second McCarthy Aff.") ¶ 4. On December 23, the day before the long Christmas weekend, Shareholder's counsel sent an email to McCarthy stating that Shareholder would agree to scheduling Adler's deposition for January 7, "provided that Mr. Adler is able to produce documents responsive to the subpoena by December 30." Id. ¶ 4 & Ex. 2. Before McCarthy could respond or make any representations regarding the production of documents, Shareholder's counsel sent him a notice of deposition for January 7, 2005. Id. ¶ 4 & Ex. 3. Over the course of the next week, Shareholder's counsel and McCarthy exchanged several emails, voice mail messages and other unilateral communications regarding matters relating to Adler's deposition, such as Shareholder's intent to videotape the deposition and Adler's potential production of documents. However, there never was any final confirmation of January 7, 2005, as the deposition date. Id. ¶¶ 5-6.

On January 6, McCarthy sent a letter to counsel for both Shareholder and the Defendants, in which he stated that there was a "possibility that Mr. Adler may wish to invoke his privilege against self-incrimination in response to certain questions posed to him." Id. ¶ 7 & Ex. 6. McCarthy expressed his belief that under existing Supreme Court

---

[1] A copy of this Order is attached as Exhibit 1 to the Affidavit of Richard J. McCarthy, dated January 11, 2005, which is submitted herewith and in support of Adler's opposition to Shareholder's Emergency Motion for Contempt and/or Discovery Sanctions and to Compel the Deposition of Robert Adler.

precedent, Adler still could provide non-incriminating answers to questions at his deposition without waiving his right to assert the privilege with regard to other questions. Id. But McCarthy said that to prevent any future disputes or uncertainty over this potential waiver issue, he had drafted a "stipulation that would memorialize Mr. Adler's ability to provide non-incriminating testimony without waiving his right to invoke his privilege against compelled self-incrimination." Id. Specifically, the stipulation stated that "to the extent Adler responds to questions at his deposition, Adler's answers to such questions and the fact that he has answered said questions shall not be construed or asserted by any party as a waiver of Adler's right to invoke his privilege against self-incrimination in response to any other questions asked of Adler during the course of the above-captioned action." Id.. In his letter, McCarthy asked the respective counsel for all parties to "either sign and return the stipulation in advance of tomorrow's deposition or advise me of any reasons why you might be unwilling to do so." Id.

Counsel for CCBN and Thomson was willing to discuss the stipulation and try to reach an accommodation that would protect the rights of Adler and the Defendants. Shareholder's counsel, however, declined to even respond to McCarthy's letter, even though it has acknowledged receiving it in the afternoon. See Shareholder's Emergency Motion for Contempt and/or Discovery Sanctions and to Compel the Deposition of Robert Adler ("Motion for Contempt") at p.3. After waiting until after the close of business for the response from Shareholder that never came, McCarthy sent a second letter to Shareholder's counsel informing him that Adler would not be available for deposition because the Fifth Amendment waiver issue had not been resolved. Id. ¶ 8 &

Ex. 7. The next morning, McCarthy attempted to contact Shareholder's counsel by telephone to discuss this issue and left a voice mail. Id. ¶ 9.

Shareholder's counsel chose not to contact McCarthy in response to either of McCarthy's January 6 letters or his telephone message of January 7. Instead, Shareholder's counsel apparently decided to proceed with the deposition, despite McCarthy's notice, without notifying any other parties of this fact, and then filed the aforementioned Motion for Contempt. Id. ¶ 9-10. Subsequently, however, Shareholder finally provided Adler with some indication as to whether it would accept his proposed stipulation regarding his privilege against self-incrimination. In its Motion for Contempt, Shareholder stated that the proposed stipulation "would have given Mr. Adler carte blanche to refuse to answer questions of his choosing while remaining free to give exculpatory answers on the very same questions." Motion for Contempt at p.1. Shareholder also described Adler's proposed stipulation as seeking "overbroad protections." Id. at p.2.

In light of this, Adler has reason to believe that if he provides non-incriminating answers to some questions at his deposition, Shareholder may argue that Adler has waived his right to assert his privilege against providing compelled self-incrimination in response to other questions. Adler now brings this motion seeking both protection of this rights under the United States and Massachusetts Constitutions as well as clarification of the scope of his right to assert the privilege against self-incrimination at his deposition.

## Argument

The Fifth Amendment's privilege against compelled self-incrimination "can be asserted in any proceeding, civil or criminal ... and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U.S. 441, 444-45, reh'g denied 408 U.S. 931 (1972). The same holds true for the privilege embodied in article 12 of the Massachusetts Declaration of Rights, Commonwealth v. Wayne W., 414 Mass. 218, 228-229 (1993), which is even broader than the Fifth Amendment. See Commonwealth v. Kerr, 409 Mass. 11, 14 (1990). The privilege, however, may be waived in certain circumstances. United States v. Gary, 74 F.3d 304, 312 (1st Cir. 1996) (Saris, J.) For example, once a witness voluntarily has revealed an incriminating fact, "the privilege cannot be invoked to avoid disclosure of the details." Rogers v. United States, 340 U.S. 367, 373 (1973); United States v. Gary, 74 F.3d at 312 (emphasis added).

The Supreme Court has addressed this waiver issue on a number of occasions, beginning with Arndstein v. McCarthy, 254 U.S. 71 (1920). In that case, an involuntary bankrupt was called before special commissioners for examination under the Bankruptcy Act. 254 U.S. at 72. He refused to answer a long list of questions on the grounds that doing so might tend to incriminate him, but he later filed schedules under oath that purported to show his assets and liabilities. Id. When asked for details about these schedules, the bankrupt again asserted his Fifth Amendment privilege and refused to answer. Id. A District Court judge found him in contempt and ordered him committed to jail. Id. The Supreme Court, however, ruled that the bankrupt had not waived his

Constitutional privilege by providing his schedules of assets and liabilities, because the "schedules, standing alone, did not amount to an admission of guilt or furnish clear proof of crime, and the mere filing of them did not constitute a waiver of the right to stop short whenever the bankrupt could fairly claim that to answer might tend to incriminate him." Id.

Three years later, the case returned to the Supreme Court after the bankrupt answered some questions without invoking the privilege against self-incrimination only to refuse to answer certain follow-up questions. McCarthy v. Arndstein, 262 U.S. 355, 356-357 (1923). Once again, the Court ruled that no waiver had occurred. Id. at 358. It stated that "where the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him." Id. at 359. Since "none of the answers which had been voluntarily given by Arndstein, either by way of denials or partial disclosures, amounted to an admission or showing of guilt, we are of the opinion that he was entitled to decline to answer further questions when so to do might tend to incriminate him." Id. at 359-360.

The Supreme Court later tried to reconcile the different rulings in the Arndstein cases and Rogers by suggesting that the waiver inquiry hinged on whether the witness was "compelled to testify, as in the Arndstein type of case," or had voluntarily testified, as in Rogers. See Brown v. United States, 356 U.S. 148, 155 (1958). Where the testimony was compelled, the witness "has no occasion to invoke the privilege against self-incrimination until the testimony sought to be elicited will in fact tend to incriminate." Brown, 356 U.S. at 155. "It would indeed be irrelevant for him to do so."

Id. "If he is to have the benefit of the privilege at all, and not be confronted with the argument that he has waived a right even before he could have invoked it, he must be able to raise a bar at the point in his testimony where the immunity becomes operative." Id. This is true, even though it might result in the trier of fact receiving a one-sided account of the matters in dispute. Id. By contrast, "when a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process." Id.

Since Brown was decided, many lower courts also have focused on the distinction between a witness who is compelled to testify and one who testifies voluntarily. See, e.g., Hitchings v. Allegheny Pepsi-Cola Bottling Co., 850 F.2d 180, 181 (4th Cir. 1988) (woman who was compelled to testify before grand jury did not waive her Fifth Amendment rights by later stating that her testimony before the grand jury had been truthful); Nutramax Labs, Inc. v. Twin Labs, Inc., 32 F. Supp. 2d 331, 335 (D. Md. 1999) (contrasting Arndstein where individual was subjected to "involuntary examination" from present case where witness had voluntarily testified by affidavit and had given self-serving speech at end of Rule 30(b)(6) deposition); United States v. Clark, CIV No. 86-0288T, 1988 WL 142149, *7-8 (W.D.N.Y. July 19, 1988) (refusing to compel defendant who had answered questions at his deposition about his income to answer questions about his deductions, even though the income and deduction issues were "inextricably intertwined," since the defendant had not affirmatively and voluntarily testified about his income); Sigety v. Abrams, 492 F. Supp. 1123, 1135 (S.D.N.Y.), rev'd on other grounds, 632 F.2d 969 (2d Cir. 1980) (stating that witness who testified only pursuant to a subpoena, as opposed to voluntarily, did not waive his Fifth Amendment rights).

This particular court appears to have followed the trend of distinguishing between testimony offered voluntarily as opposed to under compulsion for the purposes of analyzing Fifth Amendment waiver issues. In <u>McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp.</u>, 117 F.R.D. 492, 493 (D. Mass. 1987) (Saris, M.J.), the Court granted a defendant's motion to compel a nonparty witness to answer certain questions at a deposition, based on the lack of evidence that answering such questions would incriminate the witness. In its opinion, this Court referenced an earlier order requiring the witness to respond to those questions that the witness agreed would not elicit incriminating disclosures but which the witness had refused to answer because of his concern with waiver. <u>Id.</u> at 492. One can infer from that reference that the nonparty witness must have expressed concern previously that by providing non-incriminating testimony, he might be waiving his privilege with regard to incriminating testimony. One can also infer that this Court ruled that since the witness was being compelled to testify about the non-incriminating matters, the privilege would remain with regard to potentially incriminating testimony. That is precisely the sort of ruling that Adler seeks in this case.

At no time has Adler voluntarily thrust himself into the controversy between Shareholder, on the one hand, and CCBN and Thomson, on the other hand. He has asserted no claims or counterclaims against anyone. He has submitted no affidavits. He has not voluntarily produced any documents. To the extent he contributes any evidence for this case, it will be because he has been compelled to do so by the subpoena served upon him by Shareholder, as modified by the December 20 Court Order. Thus, he stands in the same position as the litigant in <u>Arndstein</u> and unlike the litigant in <u>Rogers</u>. While

Adler naturally intends to comply with his obligations to testify and is willing to provide answers to questions posed to him by either party at his deposition, he foresees a possibility where he may wish to assert his Fifth Amendment privilege in response to other questions, especially since many of the claims in this case involve allegations of criminal conduct. Adler simply seeks a protective order that would preserve his rights, as he understands them to be set forth in Arndstein and Brown. Absent such an order, he might need to assert a Fifth Amendment privilege broadly, potentially covering all of his activities at CCBN.

The proposed protective order would state as follows: "to the extent that nonparty witness Robert Adler answers questions at the deposition for which he has been subpoenaed to attend and give testimony, he will not be deemed to have waived any privilege to refuse to provide self-incriminating testimony that he might possess under the Fifth Amendment of the United States Constitution or article 12 of the Massachusetts Declaration of Rights with respect to any other questions that he may be asked." Absent such an order, Adler will face an unfair and highly disruptive dilemma at his deposition. He could either provide non-incriminating testimony and run the risk of a future ruling that in so doing, he has waived his privileges against self-incrimination, or, in protecting his privileges, might over-assert them and run the risk of being sanctioned, much like the nonparty witness in McIntyre's Mini Computer Sales Group. This is a Hobson's Choice that Adler should not have to face.

## Conclusion

For all the foregoing reasons, this Court should grant Adler's motion for a protective order and enable him to answer questions at his deposition without waving his federal and state privileges against self-incrimination as to other questions.

ROBERT ADLER,

By his attorneys,

_____
Richard J. McCarthy (BBO 328600)
Mark B. Dubnoff (BBO # 637212)
EDWARDS & ANGELL, LLP
101 Federal Street
Boston, MA 02110
Tel. (617) 439-4444
Fax (617) 439-4170

January 11, 2005