# EXHIBIT 2

## UNITED STATES DISTRICT COURT

### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DIRECT REPORT CORPORATION d/b/a SHAREHOLDER.COM, )<br><br>Plaintiff, )<br><br>v. )<br><br>CCBN.COM, INC., THE THOMSON CORPORATION, ROBERT I. ADLER, JOHN DOES 1 THROUGH 5, AND JANE DOES 1 THROUGH 5, )<br><br>Defendants. ) | Civil Action No. 04-10535-PBS<br><br>FILED UNDER SEAL |

### PLAINTIFF SHAREHOLDER.COM's
### MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff Shareholder.com ("Shareholder") moves, pursuant to Fed. R. Civ. P. 37, for an order compelling the production of the following documents in the possession or control of any defendant or his/its counsel:

1.    Section 4.10 of the Company Disclosure Schedule referenced in the Merger Agreement among CCBN.com ("CCBN"), The Thomson Corporation Delaware, Inc. ("Thomson") and Boston Acquisition Co., dated as of January 28, 2004 (the "Merger Agreement"). This document contains CCBN's representations to Thomson regarding Shareholder's then potential claim against CCBN and the facts underlying that claim.

2.    All documents relating to the negotiation of Sections 8.1 and 8.2(d) of the Merger Agreement and all communications to or from any defendant

regarding those provisions.  These contractual provisions contain a partial indemnification by CCBN of Thomson against Shareholder's claims.

3.      A copy of the Escrow Agreement referenced in Section 2.6(a) of the Merger Agreement, all documents relating to the negotiation of the Escrow Agreement, and all communications to and from any defendant regarding the Escrow Agreement.  The Escrow Agreement provides security for the indemnity described above.

4.      A copy of all contracts and agreements between (a) defendant Adler and (b) defendants CCBN or Thomson regarding Adler's post-merger obligations to CCBN or Thomson, all documents relating to the negotiation of any such contract and all communications to and from any defendant regarding any such contract.  They include both Adler's non-competition agreement and the defendants' joint defense agreement.

5.      All documents that relate to (a) the determination of the purchase price paid, to be paid, by Thomson for CCBN, (b) the negotiation of the price at which Thomson would acquire CCBN, or (c) any explanation or analysis of that price by or for Thomson or CCBN.

## GROUNDS FOR THIS MOTION

A.      The first three categories of documents relate to the disclosure made by CCBN to Thomson regarding the then potential claim by Shareholder against CCBN and the facts underlying that claim, as well as the agreements between CCBN and Thomson as to who would bear the liabilities arising from Shareholder's claim.

These documents were requested.  *See* First Set of Requests for Production No. 23; Second Set of Requests for Production Nos. 43, 63 and 76, attached as Exhibit A.

- 2 -

They exist. In some cases they are specifically identified in the Merger Agreement. *See* Exhibit B hereto. In other cases their existence is confirmed by deposition testimony. *See* Exhibit C hereto. They are indisputably relevant to the subject matter of this case. They are not privileged because, as to the negotiation and implementation of CCBN's representations and its indemnifications of Thomson, the parties' interests are adverse. The documents were not produced. Their production should be required.

B.    The fourth category -- contractual agreements between defendant Adler and the corporate defendants -- are relevant to the subject matter of the case because they contain the terms of Adler's continuing obligations to Thomson and CCBN of Thomson/CCBN's obligations to Adler. The joint defense agreement has been cited repeatedly as a reason why relevant evidence should not be provided. Because it provides the basis for a claim of privilege, it should be produced. These documents were requested. *See* Second Set of Requests for Production No. 45, attached as Exhibit D hereto. The documents exist. *See* Exhibit E hereto. They should be produced.

C.    The final category -- documents relating to the price paid by Thomson for CCBN -- were requested. *See* Second Set of Requests for Production No. 43 and 76, attached as Exhibit F hereto. It is inconceivable that they do not exist. Thomson paid $155,000,000 for CCBN. The price must have been negotiated between Thomson and CCBN and then justified to, and analyzed by, the Boards of Directors and senior management of the two companies. The documents are indisputably relevant. Shareholder alleges that CCBN used the information gained by CCBN's illegal intrusion into Shareholder's computer systems to divert to CCBN Shareholder's customer relationships and the associated stream of revenue and profits. The price that Thomson agreed to pay, and that CCBN agreed to accept, for the sale of CCBN was a function of the value of CCBN's stream of

- 3 -

revenues and profits.  The ways in which that price was determined and the parties'
evaluation of that price are, therefore, relevant to a determination of the value of the
stream of revenues and profits that CCBN diverted from Shareholder.  The requested
documents should be produced.

Dated:  September 30, 2005

Respectfully submitted,

DIRECT REPORT CORPORATION
d/b/a. SHAREHOLDER.COM
By its attorneys,

Robert S. Frank, Jr.  (BBO# 177240)
Carlos Pérez-Albuerne (BBO# 640446)
CHOATE, HALL & STEWART
Two International Place
Boston, MA 02110
(617) 248-5000

- 4 -

## LOCAL RULES 7.1 & 37.1 CERTIFICATION

I, Carlos Perez-Albuerne, hereby certify that prior counsel for the Plaintiff has conferred with opposing counsel before filing this Motion in an effort to resolve or narrow the issues presented.

Carlos Perez-Albuerne

## CERTIFICATE OF SERVICE

I, Carlos Perez-Albuerne, hereby certify that a true copy of this document was served by hand on this 30th day of September, 2005 upon Defendants, CCBN.com and the Thompson Corporation by delivering a copy of same to:

> Anthony S. Fiotto
> David M. Moss
> Goodwin Procter, LLP
> Exchange Place
> Boston, MA 02109
> 617-570-1324
> Fax: 617-523-1231

and by hand to Defendant, Robert Adler:

> Richard J. McCarthy
> Mark B. Dubnoff
> Edwards & Angell, LLP
> 101 Federal Street
> Boston, MA 02110
> 617-439-4444
> Fax: 617-439-4170

Carlos Perez-Albuerne

3990103v1

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIRECT REPORT CORPORATION d/b/a
SHAREHOLDER.COM
                              Plaintiff,

                                                    Civil Action No. 04-10535 PBS

        v.

CCBN.COM, INC., THE THOMSON
CORPORATION, JOHN DOES 1 through 5,
and JANE DOES 1 through 5,
                              Defendants.

## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS TO DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff Direct Report Corporation d/b/a Shareholder.com ("Shareholder.com"), requests that defendants, CCBN.com, Inc. ("CCBN") and the Thomson Corporation ("Thomson") produce each of the documents and tangible things which are specified in the "Documents Requested" identified below

### Instructions

A. Defendants are requested to produce all documents in defendants' custody, possession or control, including all documents that are in the custody of defendants' servants, attorneys, consultants, accountants or agents, regardless of the location of such documents.

B. The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine form of a pronoun shall be considered also to include within its meaning the

Johnson; Liberty Media Corporation; Metropolitan Life Insurance Company; Microsoft Corporation; Wachovia Corporation; WP Carey & Co., LLC; and Yahoo, Inc.

20. Documents sufficient to identify CCBN's annual revenues from the following clients from 2001 to the present:  Schlumberger Limited; Lucent Technologies; John Hancock Financial Services, Inc.; Manufacturer's Services Limited; R.J. Reynolds Tobacco, Inc. and Intel Corporation.

21. Communications to or from the following clients from 2001 to the present: Schlumberger Limited; Lucent Technologies; John Hancock Financial Services, Inc.; Manufacturer's Services Limited; R.J. Reynolds Tobacco, Inc.; Intel Corporation; ATA Holdings Corporation; BancWest Corporation; Barnesandnobel.com; Boise Cascade Corporation; Colgate-Palmolive Company; Genuity Inc.; Global Crossing; IBM, Inc.; ITT Industries, Inc.; Johnson & Johnson; Liberty Media Corporation; Metropolitan Life Insurance Company; Microsoft Corporation; Wachovia Corporation; WP Carey & Co., LLC; and Yahoo, Inc.

22. Documents sufficient to establish CCBN's document retention or destruction policies from 2001 to the present.

23. Communications between CCBN and Thomson personnel concerning CCBN's accessing of Shareholder.com's internal communication and computer systems, including any communications concerning potential criminal or civil liability arising from CCBN's actions.

24. Documents sufficient to identify the capitalization of CCBN, on a quarterly basis, from January 2003 to the present.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIRECT REPORT CORPORATION d/b/a
SHAREHOLDER.COM
                                Plaintiff,

        v.                                          Civil Action No. 04-10535 PBS

CCBN.COM, INC., THE THOMSON
CORPORATION, JOHN DOES 1 through 5,
and JANE DOES 1 through 5,
                                Defendants.

## PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS TO DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff

Direct Report Corporation d/b/a Shareholder.com ("Shareholder.com"), requests that

defendants, CCBN.com, Inc. ("CCBN") and the Thomson Corporation ("Thomson")

produce each of the documents and tangible things which are specified in the

"Documents Requested" identified below

### Instructions & Definitions

A.      Shareholder hereby incorporates by reference the instructions and

definitions set forth in its First Request for Production of Documents and Things.

B.  Unless otherwise stated, the following requests reference the time period

2000-2004.

C.  "Information Technology Topology" means a graphical depiction of the

relationship between and among individual computers interacting with CCBN's network

35. Documents describing the consolidation of CCBN's business into the financial statements of Thomson, including all notes.

36. CCBN financial statements, including all financial statements for particular product lines, from 2000 to present.

37. Documents sufficient to identify CCBN's detailed operating expenses from 2000 to present.

38. Documents concerning CCBN's classification of expenses as fixed and/or variable.

39. CCBN chart of accounts and accounting manuals from 2000 to present.

40. Business plans, marketing plans, and/or industry reports including any financial or sales growth projections, whether created by CCBN or acquired from a third party, created between 2000 and the present.

41. Documents sufficient to identify the discount and/or interest rates CCBN used for business planning purposes (e.g., hurdle rates, borrowing rates, cost of equity, or others) from 2000 to the present.

42. Documents sufficient to identify CCBN's cost of borrowing from 2000 to present.

43. Documents concerning any offers or potential offers by CCBN and/or Thomson to acquire Shareholder.com, including documents concerning valuations of Shareholder.com.

44. CCBN contracts and/or subscription agreements with the clients listed in Appendix A.

60. Documents identifying any disciplinary action taken against any CCBN employee for engaging in corporate espionage including but not limited to the intrusion into Shareholder.com's internal computer systems.

61. Documents concerning any CCBN or Thomson Board of Director meetings at which Shareholder.com was discussed, including but not limited to minutes or notes taken at such meetings.

62. Documents concerning any meeting of CCBN management at which Shareholder.com was discussed, including but not limited to minutes or notes taken at such meetings.

63. Communications between any defendant and any third party, including but not limited to Robert Adler or his counsel, concerning this litigation.

64. Documents concerning any damages defendants allege to have incurred as a result of the conduct alleged in the counterclaims.

65. Documents describing the modifications and additions made to CCBN's Focus system from January 1, 2001 through January 1, 2004.

66. Documents provided to any expert or potential expert engaged by defendants.

67. Documents sufficient to identify all improvements and enhancements made to CCBN's internal management, administrative and support software, used to run and/or operate CCBN's day to day business between 2000 to the present.

68. Documents sufficient to identify any and all changes to CCBN's internal management, administrative and support processes and procedures, used to run CCBN's day to day business between 2000 and the present.

- 8 -

69. Documents sufficient to identify all problems, concerns, deficiencies, or other issues with respect to CCBN's internal management, administrative, and support software and/or processes and procedures, in the daily operation of CCBN's business between 2000 and the present.

70. Documents concerning any comparison of the use of any functionality, capability, process and/or procedure in CCBN's business with that of Shareholder.com between 2000 and the present.

71. Documents concerning any interest, plan and/or strategy by CCBN in pursuing the acquisition of Shareholder.com's business between 2000 and the present.

72. Documents concerning any interest, plan and/or strategy by CCBN in pursuing the customers and/or potential customers of Shareholder.com between 2000 and the present.

73. Documents concerning any interest by CCBN in the functional or other operation of Shareholder.com's internal communication and computer systems between 2000 and the present.

74. Documents concerning any comparison of the products and/or services offered by CCBN to customers with those similar and/or equivalent products and/or services of Shareholder.com between 2000 and the present.

75. Lists of CCBN employee names created between 2000 to the present.

76. Documents concerning the potential acquisition of CCBN, including Thomson's potential acquisition of CCBN, including any valuation of CCBN's business or assets.

# EXHIBIT B

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

THE THOMSON CORPORATION DELAWARE INC.,

BOSTON ACQUISITION CO.

and

CCBN.COM, INC.

Dated as of January 28, 2004

Doc #:NY6:626436.13

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of January 28, 2004 (as amended, modified or supplemented from time to time, this "Agreement"), by and among THE THOMSON CORPORATION DELAWARE INC., a Delaware corporation ("Parent"), BOSTON ACQUISITION CO., a Delaware corporation and a wholly-owned subsidiary of Thomson Treasury LLC and an indirect wholly-owned subsidiary of Parent ("Merger Sub"), and CCBN.COM, INC., a Delaware corporation (the "Company").

WITNESSETH:

WHEREAS, the respective Boards of Directors of Parent, Merger Sub and the Company have each determined that this Agreement and the transactions contemplated hereby, including the Merger (as hereinafter defined), are advisable and in the best interests of their respective stockholders;

WHEREAS, the Board of Directors of the Company has adopted resolutions approving the acquisition of the Company by Parent and Merger Sub, this Agreement and the transactions contemplated by this Agreement, and has recommended that the stockholders of the Company (each a "Stockholder" and, collectively, the "Stockholders") approve this Agreement, the Merger and the transactions contemplated by this Agreement;

WHEREAS, immediately after the execution of this Agreement, (i) the holders of shares of capital stock representing at least a majority of the voting power of the outstanding capital stock of the Company, voting together as a single class, and (ii) the holders of at least a majority of the voting power of the outstanding shares of the Series D Preferred Stock, Series E Preferred Stock and Series F Preferred Stock (each as hereinafter defined), voting together as a single class, by written consent in lieu of meeting under Section 228 of the Corporation Law (as hereinafter defined) (the "Requisite Stockholder Vote") shall adopt and approve this Agreement, the Merger and the transactions contemplated by this Agreement;

WHEREAS, concurrently with the execution of this Agreement and as a condition to the willingness of Parent and Merger Sub to enter into this Agreement, Jeffrey P. Parker, Robert I. Adler, Roland C. Bemelen, Peter H. Hall, Andrew W. Augustine, Timothy Bryan and Jody N. Morse are entering into Non-Competition Agreements (collectively, the "Non-Competition Agreements"), copies of which are attached hereto as Exhibit A-1, Exhibit A-2, Exhibit A-3, Exhibit A-4, Exhibit A-5, Exhibit A-6 and Exhibit A-7, respectively;

WHEREAS, capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in Section 10.1; and

WHEREAS, Parent, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

Doc #NY6424426.13

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## THE MERGER

SECTION 1.1    The Merger.  Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time and in accordance with the General Corporation Law of the State of Delaware (the "Corporation Law"), Merger Sub shall merge with and into the Company (the "Merger") in accordance with this Agreement and the separate corporate existence of Merger Sub shall cease.  The Company shall continue as the surviving corporation in the Merger (sometimes referred to as the "Surviving Corporation") and shall continue to be governed by the laws of the State of Delaware, and the separate corporate existence of the Company with all its rights, privileges, immunities, powers and franchises shall continue unaffected by the Merger.  The Company and Merger Sub are sometimes referred to herein, collectively, as the "Constituent Corporations."

SECTION 1.2    Closing.  Unless this Agreement shall have terminated and the transactions contemplated in this Agreement shall have been abandoned pursuant to Section 9.1 hereof, the closing of the Merger (the "Closing") shall take place (a) at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, at 10:00 a.m., local time, on the seventh (7th) Business Day after the day on which the last to be fulfilled or waived of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions) shall be satisfied or waived in accordance with this Agreement or (b) at such other place and time and/or on such other date as Parent and the Company may agree in writing (the "Closing Date"); provided that, notwithstanding the foregoing, the Closing Date will be on the last Business Day of a calendar month if such last Business Day occurs at least two (2) Business Days prior to, but no more than five (5) Business Days after, such seventh (7th) Business Day; provided, further, that if the Closing Date would not otherwise occur on the last Business Day of a calendar month in accordance with the foregoing proviso, Parent may, at its option, by written notice to the Company, elect to postpone the Closing Date until the last Business Day of the calendar month in which the Closing would otherwise have occurred; provided, however, that if Parent so elects to postpone the Closing Date, (i) the Company shall deliver to Parent a certificate dated as of the CP Waiver Date (as hereinafter defined), signed by a duly authorized officer of the Company, certifying as to the satisfaction of the conditions appearing in Sections 7.2(a), 7.2(c), 7.2(e), 7.2(f) and 7.2(g) hereof as of the CP Waiver Date, (ii) assuming delivery of the certificate referred to in clause (i), Parent and Merger Sub shall be deemed to have irrevocably waived the conditions appearing in Sections 7.2(a), 7.2(c), 7.2(e), 7.2(f) and 7.2(g) as of the date that would have been the Closing Date pursuant to this Section 1.2 in the absence of such election by Parent (such date, the "CP Waiver Date"), and

Doc #NY7642M26.13

Company to such Stockholder ("Partially Paid Shares") shall be entitled to receive, in lieu of any amounts such Stockholders would have been entitled to receive under Section 2.2 for such Partially Paid Shares, an aggregate amount (after giving effect to Section 2.6 and subject to any applicable withholding tax as specified in Section 2.8) equal to the product of (i) the amount (if any) by which the Per Share Amount allocated to a share of Series A Common Stock pursuant to Section 2.2 exceeds (A) the principal amount of, plus all accrued but unpaid interest on, such loans from the date of issuance through and including the Effective Time, divided by (B) the number of shares set forth opposite such Stockholder's name on such Annex 2.5(c) (the "Partially Paid Share Spread") multiplied by (ii) the number of shares set forth opposite such Stockholder's name on such Annex 2.5(c). Following delivery to the Company of a duly executed Letter of Transmittal and such other documents as may be reasonably required by the Company, the holder of a Partially Paid Shares shall be paid in exchange therefor (after giving effect to the provisions of Section 2.6 and subject to any applicable withholding tax as specified in Section 2.8) the portion of the Cash Merger Consideration allocated to such Partially Paid Share in accordance with this Section 2.5(c). Upon any payment to any holder of a Partially Paid Shares, such Partially Paid Shares shall be canceled.

SECTION 2.6    Escrow Amount.

(a)    At the Effective Time, Merger Sub shall withhold from the Cash Merger Consideration that would otherwise be paid to (x) certain Stockholders as provided in Section 2.4(a), (y) the Paying Agent in order to make the payments provided for in Section 2.4(c), and (z) the holders of Existing Stock Options as provided in Section 2.5(a), Existing Warrants as provided in Section 2.5(b) and Partially Paid Shares as provided in Section 2.5(c), cash in an amount equal to (i) the sum of (A) five percent (5%) multiplied by the difference of (1) the Base Valuation minus (2) the Estimated Adjustments (such withheld amount of such Cash Merger Consideration being hereinafter referred to as the "Indemnity Amount") plus (B) $750,000 (such withheld amount of the Cash Merger Consideration being hereinafter referred to as the "PowerPrice Amount" and together with the Indemnity Amount, the "Escrow Amount") as security for the Continuing Company Obligations (as hereinafter defined) and (ii) $200,000 (such withheld amount of such Cash Merger Consideration being hereinafter referred to as the "Expense Reimbursement Amount") for reimbursement of out-of-pocket expenses of the Stockholders' Representatives (as hereinafter defined). At the Effective Time, Merger Sub shall deliver the Escrow Amount to a financial institution selected by Parent and reasonably acceptable to the Company, as escrow agent (the "Escrow Agent"), by wire transfer of immediately available funds to an interest-bearing account designated by the Escrow Agent prior to the Closing Date (the "Escrow Account"), which shall be held by the Escrow Agent as security for the obligations of each of the Stockholders under Article III and their indemnification obligations under Article VIII (such obligations, collectively, the "Continuing Company Obligations") and pursuant to the provisions of an escrow agreement in the form attached hereto as Exhibit D, with such changes required by the Escrow Agent that are agreed to by Parent and reasonably acceptable to the Company (the "Escrow Agreement"), to be entered into as of the Closing Date by Parent, the Company, the Escrow Agent and Jeffrey P. Parker, Robert C. McCormack and

-12-

John H. Wyant, as the representatives of the Stockholders (other than holders of Excluded Shares) and holders of Existing Stock Options and Existing Warrants (the "Stockholders' Representatives") under the Escrow Agreement and as the attorney-in-fact and agent for and on behalf of each Stockholder (other than holders of Excluded Shares) and each holder of Existing Stock Options and Existing Warrants as provided for in the Escrow Agreement. Merger Sub shall simultaneously deliver the Expense Reimbursement Amount to the Stockholders' Representatives, to be applied from time to time by the Stockholders' Representatives and (to the extent not so applied) distributed to the Stockholders (other than holders of Excluded Shares) and holders of Existing Stock Options and Existing Warrants as provided for in the letter agreement, dated as of the Closing Date, by and among the Company, Parent and the Stockholders' Representatives. The Escrow Amount and the Expense Reimbursement Amount shall be deducted and withheld from any payment made pursuant to Section 2.4 or 2.5 to each Stockholder (other than holders of Excluded Shares and Stockholders whose portion of the Cash Merger Consideration constitutes a liquidation preference under the Company Certificate of Incorporation, but only to the extent the Cash Merger Consideration paid to such Stockholder represents such liquidation preference) and each holder of Existing Stock Options and Existing Warrants *pro rata* in the same proportion as the aggregate amount payable to such holder pursuant to Section 2.4 or 2.5 (before giving effect to the provisions of this Section 2.6) bears to the amount of the Payment Fund (such holder's "Escrow Pro Rata Percentage"). The Escrow Agreement shall provide that the PowerProse Amount shall be exclusively available for indemnification claims with respect to the PowerProse Litigation and that an amount equal to (x) the PowerProse Amount plus interest and earnings thereon minus (y) the amount, if any, of indemnification payable to Parent from the Escrow Account with respect to the PowerProse Litigation shall be distributed to the Stockholders promptly after the date on which claims with respect to the PowerProse Litigation cease to survive pursuant to Section 8.1.

(b)    As a condition to receiving any portion of the Cash Merger Consideration, each of the Stockholders (other than holders of Excluded Shares, Dissenting Holders and those Stockholders whose portion of the Cash Merger Consideration constitutes a liquidation preference under the Company Certificate of Incorporation, but only to the extent the Cash Merger Consideration paid to such Stockholder represents such liquidation preference who shall only agree to the provisions of clause (i) immediately below), holders of Existing Stock Options and holders of Existing Warrants shall agree in a Letter of Transmittal or other documentation acceptable to Parent to be bound by: (i) the provisions of this Agreement including those provisions giving rise to the Continuing Company Obligations; (ii) the Escrow Agreement; (iii) the appointment of Jeffrey P. Parker, Robert C. McCormack and John H. Wyant as the Stockholders' Representatives; and (iv) the taking by the Stockholders' Representatives of any and all actions and the making of any decisions required or permitted to be taken by the Stockholders' Representatives under this Agreement and/or the Escrow Agreement, including the exercise of the power to: (A) authorize delivery to Parent of all or part of the Escrow Account in satisfaction of the Continuing Company Obligations and/or the Company's obligations under the Escrow Agreement; (B) agree to,

-13-

knowledge of the Company, threatened material charge or complaint against the Company or any of its Subsidiaries by the National Labor Relations Board or any comparable state or local agency.

(n)     Neither the Board of Directors of the Company or any of its Subsidiaries nor any committee of the Board of Directors of the Company or any of its Subsidiaries has since the Balance Sheet Date approved, committed or taken any other action to approve any bonuses for the Company's or its Subsidiaries' employees other than (i) as set forth in Section 4.9(n) of the Company Disclosure Schedule or (ii) retention bonuses referred to in Sections 6.16(a)(iv) and 6.16(b)(ii), in the amounts set forth in Section 4.9(n) of the Company Disclosure Schedule.

(o)     Concurrently with the signing of this Agreement, the Company and each of the Persons named on Annex 4.9(o) attached hereto have executed and delivered his or her Employment Agreement, each of which is attached hereto as Exhibit E (collectively, the "Employment Agreements").

(p)     Except as contemplated by Section 4.9(q) hereof, the Company does not sponsor or maintain any severance plan, policy, program or arrangement or have any other commitment with respect to any post-employment payments.

(q)     The employees listed on Schedule 7.2(t) attached hereto do not have the right to receive payments in connection with termination of employment with the Company or any of its Subsidiaries other than the payments listed opposite the names of each such employee in Section 4.9(q) of the Company Disclosure Schedule.

SECTION 4.10     Litigation, etc.

(a)     Except as set forth in Section 4.10(a) of the Company Disclosure Schedule, there are no actions, suits, proceedings, claims, complaints, disputes, arbitrations or, as to which the Company has been notified, investigations (collectively, "Claims") pending or, to the knowledge of the Company, threatened at law, in equity, in arbitration or before any Governmental Entity against or involving the Company or any of its Subsidiaries that have had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is subject to any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against the Company or any Subsidiary of the Company, except for such judgments, decrees, injunctions, rules or orders which have not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     The Company has neither had nor will have any liability with respect to the allegations of the company referred to in Section 4.10(b) of the Company Disclosure Schedule (the "Subject Company"), regarding improper access to the computer network of the Subject Company by any employee or employees of the Company or any of its Subsidiaries, or any such similar claim or other claim that was

-28-

Doc #[?]:[?]:[?]

investigated by the Office of the Attorney General of the Commonwealth of Massachusetts (the "Subject Company Claims").

SECTION 4.11   Tax Matters. Except as set forth in the relevant subsections of Section 4.11 of the Company Disclosure Schedule:

(a)     all Tax Returns required to be filed by or with respect to the Company or any of its Subsidiaries have been properly prepared and timely filed, and all such Tax Returns (including information provided therewith or with respect to thereto) are true, complete and correct in all material respects and the Company and its Subsidiaries have fully and timely paid all Taxes that are due and payable by such companies (whether or not shown on any Tax Return);

(b)     the Company and its Subsidiaries have made adequate provision in the Financial Statements for any Taxes that are not yet due and payable, for all taxable periods, or portions thereof, ending on or before the date thereof;

(c)     the Company and its Subsidiaries have given or otherwise made available to Parent true, correct and complete copies of all Tax Returns, together with all related examination reports and statements of deficiencies for taxable periods for which the applicable statutory periods of limitations have not expired;

(d)     there are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from the Company or any of its Subsidiaries for any taxable period and no request for any such waiver or extension is currently pending;

(e)     no audit or other proceeding by any Taxing Authority is pending or, to the Company's knowledge, threatened with respect to any Taxes due from or with respect to the Company or any of its Subsidiaries, no Taxing Authority has given written notice of any intention to assert any deficiency or claim for additional Taxes against the Company or any of its Subsidiaries, and no written claim has been made by any Taxing Authority in a jurisdiction where the Company and its Subsidiaries do not file Tax Returns that it is or may be subject to taxation by that jurisdiction;

(f)     the Company and the Company's Subsidiaries have not taken any reporting position on a Tax Return, which reporting position (i) if not sustained would be reasonably likely, absent disclosure, to give rise to a penalty for substantial understatement of federal income Tax under section 6662 of the Code (or any similar provision of state, local, or foreign Tax law), and (ii) has not adequately been disclosed on such Tax Return in accordance with section 6662(d)(2)(B) of the Code (or any similar provision of state, local, or foreign Tax law);

(g)     neither the Company nor any of its Subsidiaries is a party to any written agreement relating to the sharing, allocation or indemnification of Taxes, or any similar agreement, contract or arrangement, (collectively, "Tax Sharing

-29-

as of the Closing Date, except where failure of the representations and warranties described in this Section 7.3(a) to be true and correct has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Parent and Merger Sub to consummate the Merger.

(b)    Performance of Obligations of Parent and Merger Sub. Each of Parent and Merger Sub shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    Escrow Agreement. Parent shall have duly executed and delivered the Escrow Agreement.

(d)    Opinion of Counsel to Parent and Merger Sub. The Company shall have received the opinion of the General Counsel of Thomson Financial Inc., dated the Closing Date, addressed to the Company, in the form attached hereto as Exhibit G.

(e)    Certificate of Merger. Parent and Merger Sub shall have executed and delivered the Certificate of Merger.

## ARTICLE VIII

## SURVIVAL AND INDEMNIFICATION

SECTION 8.1    Representations and Warranties. All representations and warranties of the Company, Parent and Merger Sub contained in this Agreement or any certificate delivered pursuant hereto shall survive the Closing Date; provided, however, that the representations and warranties set forth in Article IV and Article V of this Agreement or in any certificate hereto shall terminate on the date which is 450 days following the Closing Date (and no claim for indemnification pursuant to this Article VIII shall be brought after such termination date), except for (a) any claim by any party hereto for fraud in connection with this Agreement or the transactions contemplated hereby which shall survive for the period of the applicable statute of limitations and (b) any claim relating to the PowerProne Litigation which shall survive until a final, nonappealable judgment rendered by the court of last resort (or by a lower court if not timely appealed) in such suit shall have been entered or the PowerProne Litigation shall have been dismissed with prejudice, and the entire amount (if any) of any indemnification payable with respect thereto shall have been paid; provided, however, that nothing in this Agreement shall be deemed to limit the remedies of the Surviving Corporation against any Stockholder with respect to the matters addressed in the Letter of Transmittal accompanying such Stockholder's delivery of stock certificates to Parent or the Paying Agent, including representations and warranties as to ownership. The obligations of each party hereto with respect to its respective covenants and agreements in this Agreement shall survive for their respective terms. Any investigations by or on behalf of any party hereto shall not constitute a waiver as to enforcement of any representation, warranty, covenant or agreement contained herein.

-63-

SECTION 8.2     Indemnification by the Stockholders.  Subsequent to the Effective Time (subject to the other provisions of this Article VIII) and regardless of any investigation made at any time by or on behalf of Parent, Merger Sub or any information Parent or Merger Sub may have, Parent, Merger Sub and their respective affiliates, officers, directors, employees, agents, subsidiaries, partners, members and controlling persons (collectively, the "Parent Indemnitees") shall be held harmless against and with respect to, and shall be reimbursed from the Escrow Account for:

(a)     any and all losses, liabilities, claims, actions, suits, proceedings, diminution in value or damages at law or in equity, before any court, government department, commission, board, agency or instrumentality ("Damages"), resulting from any breach of any representation or warranty of the Company contained herein or in any certificate, document or instrument prepared by the Company and delivered to Parent or Merger Sub hereunder;

(b)     any and all Damages resulting from (i) any nonfulfillment of any covenant or agreement by the Company contained herein or in any certificate, document or instrument prepared by the Company and delivered to Parent or Merger Sub hereunder or (ii) the allocation of the Cash Merger Consideration among the various holders of the Shares;

(c)     any and all Damages created by, arising out of or in any way related to the lawsuit captioned PowerProse, Inc. v. CCBN.COM, Inc. (Case Number 03-5097-F) (the "PowerProse Litigation") (it being understood and acknowledged that all claims for Damages under this Section 8.2(c) shall be satisfied only from the PowerProse Amount plus all interest and earnings thereon);

(d)     one half of any and all Damages created by, arising out of or in any way related to the Subject Company Claims (it being agreed that the other half of any such Damages will not be indemnified against in any manner); and

(e)     any and all Damages, reasonable costs and expenses (including legal costs and expenses) incident to any of the foregoing or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity (clauses (a) through (e), collectively, the "Parent's Damages").

SECTION 8.3     Indemnification by Parent and Merger Sub.  Subsequent to the Effective Time (subject to the other provisions of this Article VIII) and regardless of any investigation made at any time by or on behalf of the Company or any information the Company may have, the Stockholders (other than Parent, Merger Sub and any affiliate of Parent and Merger Sub) and their respective affiliates, officers, directors, employees, agents, subsidiaries, partners, members and controlling persons (collectively, the "Company Indemnitees" and together with the Parent Indemnitees, the "Indemnified Parties") shall be held harmless against and with respect to:

(a)     any and all Damages, resulting from any breach of any representation or warranty of Parent and Merger Sub contained herein or in any

-64-

Doc #DY02DS601.15

# EXHIBIT C

Beaulieu 0915 DRAFT.txt

1

1        UNCORRECTED DRAFT TRANSCRIPT

2    Deposition of Roland Beaulieu

3    taken in Boston at Palmer & Dodge

4    on Thursday, September 15, 2005

5

6        THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

7

8    This realtime transcription has not been checked or

9    proofread.  It is the court reporter's uncorrected

10   steno translation, not the certified transcript. You

11   may see untranslated keystrokes and mistranslations

12   which result in nonsensical word combinations.

13

14   THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL RECORD

15   WHICH MAY BE RELIED UPON FOR THE VERBATIM CITATION

16   OF TESTIMONY.  PLEASE DO NOT QUOTE VERBATIM FROM THE

17   DRAFT TRANSCRIPT!

18

19   The transcript will be certified by me after it is

20   proofread and corrections made; so punctuation,

21   proper name spellings, and formatting may be

22   different.  Title page(s) and appearances will be

23   added to the certified transcript, so page numbers

24   and line numbers will not correspond to what you see

25   on your screen.

u

Page 1

Beaulieu 0915 DRAFT.txt

17    Q.    Mr. Beaulieu, welcome back.  We were

18   discussing the subject of your communications with

19   Mr. Parker when we broke.  I would like to stay

20   there for a moment and ask you:  In your

21   conversations with Mr. Parker, have you segregated

22   in some way information that you believe Mr. Parker

23   obtained from Hale and Dorr and then transmitted to

24   you versus information Mr. Parker obtained from

25   another source and then transmitted to you?

U

48

1              UNCORRECTED DRAFT TRANSCRIPT

2    A.    I frankly didn't follow that question.

3    Q.    Is it the case that all of the information

4   that Mr. Parker has provided you in the last year

5   let's say with respect to Mr. Adler you believe

6   originates with Hale and Dorr?

7         MR. FIOTTO:  Objection.  Objection that in

8   your question you're asking him to affirm that there

9   are communications that Mr. Parker directly

10  communicated to Mr. Beaulieu about Rob Adler.

11        MR. SCOTT:  No, no, my question is what it

12  was, which was:

13  BY MR. SCOTT:

14   Q.    What's the basis for telling us that all

15  the information that you got from Mr. Parker, if

16  any, with respect to Mr. Adler originated with Hale

17  and Dorr as opposed to in Mr. Parker's other

18  experiences that don't involve lawyers?

19        MR. DUBNOFF:  Objection, vague.

                    Page 44

Beaulieu 0915 DRAFT.txt

20    A.   Again, the reason for my break, the

21  clarification was that in the communications with

22  Mr. Parker he had requested my attendance to a

23  meeting at Hale and Dorr in regards to an escrow

24  letter he had received from Thomson.

25             MR. FIOTTO:  Okay.  Please, I just want to

U

49

1             UNCORRECTED DRAFT TRANSCRIPT

2  caution you, you've answered the question.  Go

3  ahead.

4             MR. SCOTT:  Well, no, you haven't.

5  BY MR. SCOTT:

6    Q.   If I --

7             MR. FIOTTO:  Well, that wasn't the

8  question, actually.  He hasn't answered your

9  question.

10             MR. SCOTT:  He has not answered my

11  question.

12             MR. FIOTTO:  I meant he made as much of a

13  statement as I wanted him to for fear he would

14  reveal this Hale and Dorr meeting and the contents

15  of it.  But go ahead.  I'm sorry, Thane.

16             MR. SCOTT:  If the standard were the

17  witness can reveal as much information as you want,

18  we need not be here today.

19             MR. FIOTTO:  Well, that's true.

20             MR. SCOTT:  But this witness is

21  obstructing my access to responsive information.

Page 45

Beaulieu 0915 DRAFT.txt

U

64

1              UNCORRECTED DRAFT TRANSCRIPT

2    controversial doctrine.  So I instruct you not to

3    answer.

4              MR. SCOTT:  I will --

5              MR. FIOTTO:  You will not acquiesce to

6    that objection, I assume.

7              MR. SCOTT:  I will not acquiesce and I

8    will press the witness.

9    BY MR. SCOTT:

10        Q.   Have you reviewed any documents to prepare

11   for your testimony here today that originated at

12   Shareholder?

13             MR. FIOTTO:  And I instruct you not to

14   answer that question.

15             MR. DUBNOFF:  I will also raise a

16   foundation objection.

17        A.   Under advice of counsel I'm not going to

18   answer that.

19        Q.   Other than your preparation meetings with

20   counsel, did you review any documents at any other

21   time to prepare for your testimony today?

22        A.   I did not.

23        Q.   With respect to the e-mail from Hale and

24   Dorr on the subject of the escrow, did you keep a

25   copy of that e-mail?

U

Beaulieu 0915 DRAFT.txt

65

1            UNCORRECTED DRAFT TRANSCRIPT

2      A.    Yes.

3      Q.    Where is it today?

4      A.    It's probably in a personal folder that I

5    keep at work, electronic folder.

6      Q.    How long was it?

7      A.    I don't recall the length.  Perhaps four,

8    five pages.

9      Q.    Who was the author of it?

10     A.    It was Thomson.

11     Q.    Who was the sender?

12     A.    Probably their general counsel.

13     Q.    Do you remember the person's name?

14     A.    I believe it was John Robinson.

15     Q.    And did Mr. Robinson send this e-mail

16   directly to you?

17          MR. FIOTTO:  Objection, assumes that

18   Mr. Robinson sent the e-mail rather than a Hale and

19   Dorr forward.

20   BY MR. SCOTT:

21     Q.    Well, let me ask you for the e-mail chain.

22     A.    No, he did not send it to me directly.

23     Q.    Tell me who was on the e-mail chain and at

24   what levels.

25     A.    I received it from, I don't remember his

U

66

1            UNCORRECTED DRAFT TRANSCRIPT
             Page 60

Beaulieu 0915 DRAFT.txt

4  remember without looking at that document again.

5      Q.    There may have been other cc's?

6      A.    But I'm not sure.

7      Q.    But, in any event, you, Mr. Parker and

8  Mr. Jones were the direct recipients as in it was

9  to, t-o, Mr. Parker, you, and Mr. Jones.  Is that

10 right?

11     A.    I cannot be sure if I was to or cc'd.  I

12 really don't know.

13     Q.    Who else fell into the category of to or

14 cc other than Mr. Jones and Mr. Parker and yourself?

15           MR. DUBNOFF:  Objection.

16     A.    It would be just an assumption on my part.

17     Q.    Well, who do you remember being in the to

18 or the cc category on this e-mail?

19     A.    Besides myself, Mr. Jones and Mr. Parker,

20 that's all I can recall.

21     Q.    When was it sent?

22     A.    My assumption it was around July or early

23 August.  But I can't be certain.

24     Q.    And in what capacity was Mr. Robinson

25 referenced?

U

68

1           UNCORRECTED DRAFT TRANSCRIPT

2           MR. FIOTTO:  Objection, calls for the

3  witness to reveal an obvious attorney-client

4  communication, and I instruct you not to answer.

5           MR. SCOTT:  Well, my question was not

6  intended to be provocative, but....  Let me see if

Page 62

Beaulieu 0915 DRAFT.txt

7      I can press it.

8      BY MR. SCOTT:

9          Q.    Was Mr. Robinson referenced as a sender or

10     a recipient or otherwise in this e-mail?

11         A.    Mr. Robinson was the sender.

12         Q.    And --

13         A.    The sender?  I'm sorry.  Let me make it

14     very clear.  The document that was copied to us was

15     from Mr. Robinson.  He did not send it directly to

16     us.

17         Q.    So I take it the e-mail chain begins with

18     Mr. Robinson, to your knowledge, goes to Ned at Hale

19     and Dorr and then through Ned to you, Mr. Jones and

20     Mr. Parker and perhaps others?

21         A.    I'm not sure it worked that way.  I

22     believe it was from Mr. Robinson to the escrow

23     agents and maybe Mellon Bank, who were the escrow

24     agents at that time.  That's my recollection of the

25     trail.

U

                                                        69

1                UNCORRECTED DRAFT TRANSCRIPT

2          Q.    So Mr. Robinson sent the e-mail to the

3      escrow agent.  And how did the e-mail then get from

4      the escrow agent to you?

5              MR. DUBNOFF:  Objection, vague.

6          A.    I either had a conversation with

7      Mr. Parker or an e-mail from Jeff if I would review

8      the correspondence --

                       Page 63

Beaulieu 0915 DRAFT.txt

77

1          UNCORRECTED DRAFT TRANSCRIPT

2    summarized in another document?

3          MR. FIOTTO:  And just identify the

4    document in terms of whether it has a sender, a

5    recipient and a date.

6     A.    Hope I don't get in trouble, but....  It

7    was in response to the original note from job

8    Robinson.  I did review that after that meeting,

9    subsequent to that meeting, before being sent back

10   to Mr. Robinson.

11    Q.    Is it your understanding that a document

12   summarizing notes taken at the Hale and Dorr meeting

13   was then sent to John Robinson?

14    A.    Let me try to restate that.  I never

15   reviewed any notes that Ned was taking, but I did

16   review a response to John Robinson's original letter

17   prior to it going officially back to Thomson.

18    Q.    When did that document go back to Thomson?

19    A.    It would just be speculation on my part

20   but I believe it was late August --

21         MR. FIOTTO:  I would caution the witness

22   not to speculate.

23   BY MR. SCOTT:

24    Q.    When did you see the document before it

25   went to Thomson?

U

78

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DIRECT REPORT CORPORATION d/b/a SHAREHOLDER.COM<br><br>        Plaintiff,<br><br>    v.<br><br>CCBN.COM, INC., THE THOMSON CORPORATION, JOHN DOES 1 through 5, and JANE DOES 1 through 5,<br>        Defendants. | Civil Action No. 04-10535 PBS |

## PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS TO DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff Direct Report Corporation d/b/a Shareholder.com ("Shareholder.com"), requests that defendants, CCBN.com, Inc. ("CCBN") and the Thomson Corporation ("Thomson") produce each of the documents and tangible things which are specified in the "Documents Requested" identified below

### Instructions & Definitions

A.    Shareholder hereby incorporates by reference the instructions and definitions set forth in its First Request for Production of Documents and Things.

B.  Unless otherwise stated, the following requests reference the time period 2000-2004.

C.  "Information Technology Topology" means a graphical depiction of the relationship between and among individual computers interacting with CCBN's network

45. Agreements, including non-disclosure agreements, between Thomson or CCBN and Jeffrey Parker, Robert Adler and/or Timothy Bryan.

46. Documents concerning CCBN's Information Infrastructure Topology between 2000 and 2004.

47. Documents sufficient to identify any policies, procedures, standards or guidelines used to manage CCBN's information technology between 2000 and 2004.

48. All policies, procedures, standards, and guidelines for the use of CCBN's user authentication services, access control services, domain control services, Internet access services, public Internet Protocol address assignment services, remote access services, virtual private network services, terminal services, electronic mail services, gateway devices and services, bastian hosts, proxy devices and services, instant messaging services, or internet relay chat services applicable to the following CCBN employees or agents between 2000 and 2004:

    (a)    Jeffrey Parker

    (b)    Robert Adler

    (c)    Timothy Bryan

    (d)    direct reports to Robert Adler

    (e)    consultants providing services to Robert Adler

    (f)    information technology personnel providing support to Robert Adler

    (g)    any employees with sales, marketing or business development responsibilities who communicated with Robert Adler

- 5 -

EXECUTION COPY

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

THE THOMSON CORPORATION DELAWARE INC.,

BOSTON ACQUISITION CO.

and

CCBN.COM, INC.

Dated as of January 28, 2004

Doc #:NY6:636434.13

<u>Exhibits</u>

| | |
|---|---|
| Exhibit A-1 | Non-Competition Agreement of Jeffrey P. Parker |
| Exhibit A-2 | Non-Competition Agreement of Robert I. Adler |
| Exhibit A-3 | Non-Competition Agreement of Roland C. Beaulieu |
| Exhibit A-4 | Non-Competition Agreement of Peter E. Hall |
| Exhibit A-5 | Non-Competition Agreement of Andrew W. Augustine |
| Exhibit A-6 | Non-Competition Agreement of Timothy Bryan |
| Exhibit A-7 | Non-Competition Agreement of Jody N. Morse |
| Exhibit B | Form of Certificate of Incorporation of the Surviving Corporation |
| Exhibit C | Form of Letter of Transmittal |
| Exhibit D | Form of Escrow Agreement |
| Exhibit E | Employment Agreements |
| Exhibit F | Form of Hale and Dorr LLP Opinion |
| Exhibit G | Form of General Counsel Opinion |

<u>Schedules</u>

| | |
|---|---|
| Schedule 2.2(a) | Examples of Calculation of Cash Merger Consideration |
| Schedule 6.1 | Parent Officers |
| Schedule 6.16 | Certain Severance Payments |
| Schedule 7.2(d) | Required Consents |
| Schedule 7.2(q) | Agreements to be Terminated |
| Schedule 7.2(r) | Terminated Employees |
| Schedule 10.1 | Knowledge of the Company |

<u>Company Disclosure Schedule</u>

| | |
|---|---|
| Section 4.1(a) | Organization, Qualification |
| Section 4.1(b) | Company Subsidiaries Organization, Qualification |
| Section 4.2(a)(I) | Company Common and Preferred Stock |
| Section 4.2(a)(ii) | Company Stock Options |
| Section 4.2(a)(iii) | Company Warrants |
| Section 4.2(b) | Company Securities |
| Section 4.3(a)(i) | Company Subsidiaries |
| Section 4.3(a)(ii) | Subsidiary Ownership |
| Section 4.3(b) | Equity Interests |
| Section 4.5(a) | Consents and Approvals |
| Section 4.6(a) | Material Adjustments to Company Financials |
| Section 4.6(b) | Non-Ordinary Course |
| Section 4.6(c) | Company Revenue |
| Section 4.7(a) | Balance Sheet Date Changes |
| Section 4.7(b) | Material Changes as of September 30, 2003 |
| Section 4.9(a) | Employee Benefits |

Doc #NY6454545.3

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIRECT REPORT CORPORATION d/b/a
SHAREHOLDER.COM
                          Plaintiff,

                                                    Civil Action No. 04-10535 PBS

         v.

CCBN.COM, INC., THE THOMSON
CORPORATION, JOHN DOES 1 through 5,
and JANE DOES 1 through 5,
                          Defendants.

## PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS TO DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff Direct Report Corporation d/b/a Shareholder.com ("Shareholder.com"), requests that defendants, CCBN.com, Inc. ("CCBN") and the Thomson Corporation ("Thomson") produce each of the documents and tangible things which are specified in the "Documents Requested" identified below

### Instructions & Definitions

A.      Shareholder hereby incorporates by reference the instructions and definitions set forth in its First Request for Production of Documents and Things.

B.   Unless otherwise stated, the following requests reference the time period 2000-2004.

C.   "Information Technology Topology" means a graphical depiction of the relationship between and among individual computers interacting with CCBN's network

35. Documents describing the consolidation of CCBN's business into the financial statements of Thomson, including all notes.

36. CCBN financial statements, including all financial statements for particular product lines, from 2000 to present.

37. Documents sufficient to identify CCBN's detailed operating expenses from 2000 to present.

38. Documents concerning CCBN's classification of expenses as fixed and/or variable.

39. CCBN chart of accounts and accounting manuals from 2000 to present.

40. Business plans, marketing plans, and/or industry reports including any financial or sales growth projections, whether created by CCBN or acquired from a third party, created between 2000 and the present.

41. Documents sufficient to identify the discount and/or interest rates CCBN used for business planning purposes (e.g., hurdle rates, borrowing rates, cost of equity, or others) from 2000 to the present.

42. Documents sufficient to identify CCBN's cost of borrowing from 2000 to present.

43. Documents concerning any offers or potential offers by CCBN and/or Thomson to acquire Shareholder.com, including documents concerning valuations of Shareholder.com.

44. CCBN contracts and/or subscription agreements with the clients listed in Appendix A.

69. Documents sufficient to identify all problems, concerns, deficiencies, or other issues with respect to CCBN's internal management, administrative, and support software and/or processes and procedures, in the daily operation of CCBN's business between 2000 and the present.

70. Documents concerning any comparison of the use of any functionality, capability, process and/or procedure in CCBN's business with that of Shareholder.com between 2000 and the present.

71. Documents concerning any interest, plan and/or strategy by CCBN in pursuing the acquisition of Shareholder.com's business between 2000 and the present.

72. Documents concerning any interest, plan and/or strategy by CCBN in pursuing the customers and/or potential customers of Shareholder.com between 2000 and the present.

73. Documents concerning any interest by CCBN in the functional or other operation of Shareholder.com's internal communication and computer systems between 2000 and the present.

74. Documents concerning any comparison of the products and/or services offered by CCBN to customers with those similar and/or equivalent products and/or services of Shareholder.com between 2000 and the present.

75. Lists of CCBN employee names created between 2000 to the present.

76. Documents concerning the potential acquisition of CCBN, including Thomson's potential acquisition of CCBN, including any valuation of CCBN's business or assets.

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIRECT REPORT CORPORATION d/b/a SHAREHOLDER.COM, )<br><br>Plaintiff, )<br><br>v. )<br><br>CCBN.COM, INC., THE THOMSON CORPORATION, ROBERT I. ADLER, JOHN DOES 1 THROUGH 5, AND JANE DOES 1 THROUGH 5, )<br><br>Defendants. ) | Civil Action No. 04-10535-PBS |

**PLAINTIFF SHAREHOLDER.COM'S MOTION TO IMPOUND ITS OPPOSITION TO DEFENDANT ADLER'S MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS OF PERSONS PREVIOUSLY DEPOSED BY DEFENDANT CCBN.COM**

Pursuant to Local Rule 7.2, Plaintiff Shareholder.com moves for the impoundment of its Shareholder.com Opposition to Defendant Adler's Motion For Leave To Take Additional Depositions of Persons Previously Deposed By Defendant CCBN.com, which is being delivered by hand to the Court today. The motion discusses and attaches excerpts of deposition transcripts that have been designated as "Highly Confidential" under the Stipulated Protective Order in this case. *See* Docket No. 37. Under that Order, Shareholder.com is required to seek impoundment of any documents filed with the Court containing "Confidential" or "Highly Confidential" information. *See id.* at ¶ 14. Shareholder accordingly moves for impoundment.

3990096v1

Respectfully submitted,

DIRECT REPORT CORPORATION
d.b.a. SHAREHOLDER.COM
By its attorneys,

Robert S. Frank, Jr. (BBO# 177240)
Carlos Perez-Albuerne (BBO# 640446)
CHOATE, HALL & STEWART
Two International Place
Boston, MA 02110
(617) 248-5000

Dated:  September 30, 2005

- 2 -

3990096v1

## CERTIFICATE OF SERVICE

I, Carlos Perez-Albuerne, hereby certify that a true copy of this document was served by hand on this 30th day of September, 2005 upon Defendants, CCBN.com and the Thompson Corporation by delivering a copy of same to:

> Anthony S. Fiotto
> David M. Moss
> Goodwin Procter, LLP
> Exchange Place
> Boston, MA 02109
> 617-570-1324
> Fax: 617-523-1231

and by hand to Defendant, Robert Adler:

> Richard J. McCarthy
> Mark B. Dubnoff
> Edwards & Angell, LLP
> 101 Federal Street
> Boston, MA 02110
> 617-439-4444
> Fax: 617-439-4170

Carlos Perez-Albuerne